UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ANTONIO FELIPE TERRA PINTO DE QUEIROZ | ) ) ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) ) | Civ. No. 4:25-cv-40161 |
| BRUNA PIRES SCHUENCK | ) ) ) | |
| Respondent. | ) ) ) | |

# FINDINGS OF FACT AND CONCLUSIONS OF LAW

**GUZMAN, J.**

This is a dispute between two Brazilian parents. After taking her child to the United States to visit family, the mother did not return to Brazil. Instead, the mother decided to stay in Massachusetts to pursue a master's degree. Citing a joint custody agreement approved by a Brazilian court, the father objected to the child's retention in the United States and demanded the child's return. Unable to convince the mother to return the child to Brazil, the father petitioned this Court for the child's return under the Hague Convention.[1] That petition is now before the Court.

Under the Hague Convention, the Court's task is limited to determining the "most appropriate forum" for the adjudication of the parent's custody dispute. Monasky v. Taglieri, 589 U.S. 68, 79 (2020). For the reasons stated below, the Court finds that forum to be Brazil. Accordingly, the Court **GRANTS** the father's petition and orders the child's return to Brazil.

This determination is neither an endorsement of one parent over the other nor a judgment regarding what is in the child's best interest. Such assessments are beyond the Court's jurisdiction.[2]

---

[1] These facts are discussed *supra* in detail with citations to the record.
[2] Courts may not "weigh[] in on permanent arrangements" or "resolv[e] any underlying custody dispute in adjudicating a return petition." See Golan v. Saada, 596 U.S. 666, 680–81 (2022) (citing 22 U.S.C. § 9001(b)(4)).

1

The Court notes only that, notwithstanding their profound disagreement, both parents' actions appear to be motivated by the same goal: safeguarding the child's wellbeing.

I.      **PROCEDURAL HISTORY**

Antonio Felipe Terra Pinto de Queiroz ("Petitioner") filed a petition (the "Petition") against the mother of his child—Bruna Pires Schuenck ("Respondent")—seeking return of the parties' minor daughter ("child" or "L.T.P.D.Q.S.") to Brazil under the International Child Abduction Remedies Act ("ICARA"). 22 U.S.C. § 9001 *et seq.*; [see ECF No. 1, ("Petition" or "Pet.")]. ICARA, a federal statute, implements the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or "Convention"), Oct. 25, 1980, T.I.A.S. No. 11, 670, 1343 U.N.T.S. 89.

The Petition was filed on October 8, 2025. [Pet]. On the same day, Petitioner sought a temporary restraining order prohibiting Respondent from removing the child from Massachusetts pending resolution of the Petition and requiring Respondent to surrender the child's passport. [ECF No. 2 at 2–3]. In response to the Petition, on November 20, 2025, Respondent filed a "Statement of Facts." [ECF No. 10]. On November 25, 2025, the Court held a preliminary hearing regarding logistical and procedural requirements of the evidentiary hearing on the merits of the Petition. [ECF No. 17]. Respondent, acting *pro se*, did not appear. [Id.] Claiming inadequate notice of the hearing, Respondent filed a motion to reschedule the hearing. [ECF No. 19]. Because the hearing concerned purely logistical and procedural matters and Respondent was not prejudiced by her absence, the Court denied Respondent's motion without ruling on her inadequate notice allegations.[3] [ECF No. 23]. The Court granted Petitioner's request for a temporary restraining order in part on November 25, 2025. [ECF No. 18].

---

[3] The Court provided Respondent with a transcript of the hearing to ensure that she was not prejudiced in preparing for the evidentiary hearing. [ECF No. 23].

Consistent with the Hague Convention's directive to "act expeditiously in proceedings for the return of children," the Court held an evidentiary hearing on December 15, 2025. [ECF No. 27]; Hague Convention, art. 11. Petitioner was represented by counsel; Respondent proceeded *pro se*. Both parties testified, presented opening and closing statements, conducted cross examinations, and offered exhibits into evidence.[ECF No. 27]. At the conclusion of the hearing, the Court found that the child had been wrongfully retained in violation of Petitioner's custody rights in Brazil—the child's country of habitual residence. [Id.] The Court further found that return would not subject the child to a grave risk of harm or otherwise place the child in an intolerable situation. [Id.] The Court issued its order from the bench at the conclusion of the hearing.[4] This memorandum sets forth the Court's formal findings of fact and conclusions of law in support of that order.

## II.  APPLICABLE LAW

The Hague Convention was adopted by the signatory nations—including the United States and Brazil—"to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access."[5] Hague Convention, pmbl. The Convention seeks to discourage international forum shopping in child custody disputes, Diaz-Alarcon v. Flandez-Marcel, 944 F.3d 303, 305 (1st Cir. 2019), and encourage the adjudication of custody rights "in what is presumptively the most appropriate forum—the country where the child is at home." Monasky, 589 U.S. at 79 (emphasis added). The Court resolves the Petition with the Convention's purposes firmly in mind. See e.g., da Costa, 94 F.4th at 181 (quoting Cannon v.

---

[4] The Court ordered that the child be returned by December 22, 2025. Unable to meet that deadline given a delay in obtaining the child's renewed passport, Petitioner and Respondent worked collaboratively under the Court's supervision to expeditiously effectuate the child's return. [ECF Nos. 28, 30].

[5] The United States and Brazil are parties to the Hague Convention. See da Costa v. de Lima, No. 22-CV-10543-, 2023 WL 4049378, at *1 (D. Mass. June 6, 2023), aff'd, 94 F.4th 174 (1st Cir. 2024) ("Over one hundred countries—including both the United States and Brazil—have signed the Hague Convention on the Civil Aspects of International Child Abduction.").

3

Cannon, [2004] EWCA (Civ) 1330, [2005] 1 W.L.R. 32 (Eng.) ¶ 38) (citing an English court's observation that "the exercise of a discretion under the Convention requires the court to have due regard to the overriding objectives of the Convention whilst acknowledging the importance of the child's welfare").

The federal statute implementing the Hague Convention—ICARA—allows a parent to petition a court for the return of their wrongfully removed child to the child's country of habitual residence. See 22 U.S.C. § 9003(b). To prevail, the petitioning parent must establish by a preponderance of the evidence that the other parent "wrongfully removed or retained [the child] within the meaning of the Convention."[6] Id. § 9003(e)(1). To establish that a retention[7] is "wrongful" under the Convention, the petitioner must show that he or she:

1) seeks to return the child to the child's country of habitual residence,

2) had custody rights immediately prior to the child's removal, and

3) was exercising those rights.

Mendez v. May, 778 F.3d 337, 343 (1st Cir. 2015) (citing Hague Convention, art. 3). Once a petitioner establishes wrongful retention under the Convention, ICARA requires that the child be promptly returned unless one of the Convention's "narrow" affirmative defenses apply. 22 U.S.C. § 9001(a)(4). These affirmative defenses include

> that (1) the child objects to being returned and is of sufficient age and maturity for [their] views to be taken into account, Hague Convention, art. 13; (2) the petitioner commenced the proceeding more than a year after the child's wrongful removal or retention and the child has become well-settled in his new environment, id. art. 12; and (3) returning the child would pose a 'grave risk' to [their]

---

[6] A preponderance of the evidence means "more likely true than not." United States v. Marino, 833 F.3d 1, 15 (1st Cir. 2016).

[7] The language in the Convention contemplates both wrongful removal and wrongful retention. Going forward, the Court will only be including retention in its citations to the Convention, as that is what is being alleged here.

> physical or psychological well-being or place him 'in an intolerable situation,' id. art. 13(b).

Swett v. Bowe, 733 F. Supp. 3d 225, 242 (S.D.N.Y 2024), aff'd sub nom. Urquieta v. Bowe, 120 F.4th 335 (2d Cir. 2024). The first two defenses must be established by a preponderance of the evidence.[8] 22 U.S.C. § 9003(e)(2)(B). The third defense must be established by clear and convincing evidence. Id. § 9003(e)(2)(A).[9] In this case, given the child's age, the first affirmative defense does not apply.[10]

In recognition of the Hague Convention's "strong presumption favoring return of a wrongfully removed child," these exceptions "are to be construed narrowly," Danaipour v. McLarey, 286 F.3d 1, 13–14 (1st Cir. 2002) (citation omitted), and "[t]his Court may exercise its discretion to order removal even if it is found that one or more of these defenses apply." De Aguiar Dias v. De Souza, 212 F. Supp. 3d 259, 270 (D. Mass. 2016) (citing Hague Convention, art. 18).

### III. FINDINGS OF FACT[11]

The Court sets forth its findings of fact below based on the Petition, Respondent's reply to the Petition, testimony at the evidentiary hearing, and the parties' documentary evidence. Unless otherwise noted, the Court finds the evidence it relies on to be credible.

---

[8] See supra note 6.
[9] Clear and convincing means that it is 'highly probable' that the facts alleged are true." Feliciano v. Vila, No. CIV. 79-4 (PG), 2007 WL 4404730, at *11 n.3 (D.P.R. Dec. 13, 2007) (quoting Colorado v. New Mexico, 467 U.S. 310, 316 (1984)).
[10] Because the child is between 6 and 7 years old, [see Pet. at ¶ 3], she has not attained a sufficient age and degree of maturity to appropriately take her views into account. See, e.g., Ngassa v. Mpafe, 488 F. Supp. 2d 514, 520 (D. Md. 2007) ("seven-year-old child has not attained the requisite age and degree of maturity"); In re D.D., 440 F. Supp. 2d 1283, 1297 (M.D. Fla. 2006) ("At age six, the child in this case has not attained an age or degree of maturity to make it appropriate to take her views into account."); Alonzo v. Claudino, No. 106-CV-00800, 2007 WL 475340, at *5 (M.D.N.C. Feb. 9, 2007) ("It is clear . . . that an eight year old child has not 'attained an age and degree of maturity at which it is appropriate to take account of [her] views.'") (citation omitted).
[11] Any finding of fact that is more aptly characterized as a conclusion of law, or any conclusion of law that is more aptly characterized as a finding of fact, is adopted as such.

### A. The Parties

Petitioner and Respondent—biological parents of L.T.P.D.Q.S.—are both citizens of Brazil. [Pet. ¶ 1; ECF No. 1-6 at 2 (Ex. D to Pet)]. Until her removal to the United States, L.T.P.D.Q.S. was born and raised in Brazil for the first five years of her life without interruption. [See id. ¶¶ 8–9 (sic);[12] Hr'g Tr. 13:17–19].[13] Petitioner and Respondent were never married and live separately. [See Hr'g Tr. 13:15–24]. The parties' relationship is limited to co-parenting. [See id.] Neither Petitioner nor Respondent make any allegations of threatened or actual physical violence against the other nor any allegations that the child is unsafe under the other's care. [See generally, Pet.; ECF No. 10; Hr'g Tr. 60:5–6]. Based on the totality of the evidence (albeit limited given the expedited nature of the proceeding), the Court agrees with a Brazilian judge's observation that "both parents have equal aptitude to provide for the child's best interest." [ECF No. 1-7 at 3 (Ex. E to Pet.)].

### B. The Joint Custody Agreement

Petitioner and Respondent share custody of L.T.P.D.Q.S. [See ECF No. 1-5 at 2 (Ex. C to Pet.)]. Their respective custodial rights are defined by a joint custody agreement ("JCA") approved by a Brazilian court on July 24, 2024. [Id. at 2–3]. The terms of the JCA were reached at a family court hearing before a judge at which both Respondent and Petitioner were represented by counsel. [Id. at 3]. The JCA provides that "[c]ustody will be shared" between Respondent and Petitioner with "the child's residence fixed at the mother's home." [Id. at 2]. In addition to outlining the parties' custodial rights, the JCA discusses travel with the child. Specifically, the JCA provides:

> Finally, the parties agree that, for any travels with the child, they commit to providing each other with information regarding the

---

[12] The numbering of the Petition paragraphs goes from 5 to1 on page two and from 34 to 4 on pages 7–8.
[13] "Hr'g Tr." denotes the transcript of the December 15, 2025 evidentiary hearing. The Court's citations to the hearing transcript are to the Court Reporter's original, unedited version, on file with the Court. The final version may have slightly different line and/or page numbers.

6

>       address and phone number of the place of stay, as well as the
>       length of time they will remain there.

[Id. at 3]. One parent's travel with the child may interfere with the other parent's custodial rights under the JCA. Here, because Petitioner is entitled to parenting time on most weekends, [Id. at 2], if Respondent travels with the child during one of Petitioner's weekends, such travel necessarily requires Petitioner's consent and entitles him to request make-up parenting time for the days missed under the JCA. That is what occurred here. When Respondent sought to travel with the child to the United States for an extended trip—discussed in detail below—Petitioner conditioned his consent on Respondent relinquishing a portion of her parenting time upon return to compensate for Petitioner's missed time. [See Pet. ¶¶ 10–13 (sic)].

Neither party disputes the enforceability or validity of the JCA or any of its terms. Without engaging in a Brazilian contract law analysis, the Court finds that the JCA establishes that Petitioner and Respondent share custody of the child.

### C. **Respondent is the Child's Primary Caregiver**

For the first five years of the child's life—while the parties resided in Brazil—it is not in dispute that Respondent bore the primary weight of day-to-day parenting responsibilities. [See ECF No. 1-5 (JCA provides that the majority of Petitioner's in-person parenting time occurs on weekends only); Hr'g Tr. 21:3–9 (Petitioner's testimony regarding weekend visits)]. While Petitioner advocated for and obtained custody rights, the Court finds that Petitioner was substantially less involved on a day-to-day basis in the child's life than Respondent. The Court credits Respondent's testimony that she attended most (if not all) of the child's pediatrician and school appointments in Brazil. [See Hr'g Tr. 52:8–16, 53:13–22]. The Court is mindful that Respondent's responsibility for the child's medical appointments and education are just two examples of her many responsibilities as the child's primary caregiver. The Court's finding that

7

Respondent is the primary caregiver is based only on the comparative amount of time the parties expended on childcare. Put differently, it is a quantitative finding that should not be construed as a qualitative evaluation of the parties' comparative aptitude for caring for the child.

Additionally, Petitioner claims—and Respondent does not contest—that Respondent (with the help of her family) has been and continues to be the majority financial provider for the child's care. [Id.] Petitioner has made and continues to make routine financial contributions to the child's care. [Id. at 59:2–9]. Although the record contains testimonial and documentary evidence on the topic, the Court need not—and does not—make any findings regarding the parties' <u>specific</u> monetary contributions and declines to credit the monetary amounts in the record.

### D. **Petitioner Has Not Abandoned the Child**

Petitioner has been consistently present in the child's life. Respondent's allegations that Petitioner engaged in "a pattern of abandonment" that would "expose [the child] to severe psychological harm" should she return to Brazil are unsupported by the evidence. [ECF No. 10 at 2–3]. For the reasons stated below, the Court finds that Petitioner has not engaged in a pattern of abandonment.[14]

The record evidence regarding Petitioner's involvement in the child's life is at odds with Respondent's abandonment allegations. Petitioner fought for and obtained custody rights,[see ECF No. 1-5], and exercised his rights by visiting the child most weekends prior to the child's removal from Brazil. [Hr'g Tr. 21:3–9]. For example, prior to her removal, Petitioner routinely took the child to swim lessons, cared for the child during numerous overnight visits, and played with the child at the park. [Id.] On January 24, 2024, during one visit, Petitioner sent Respondent a picture

---

[14] The Court adopts the plain, ordinary meaning of abandonment. <u>Abandon</u>, merriam-webster.com/dictionary/abandon (last visited Jan. 6, 2026) (defining "abandon" as "to give up with the intent of never again claiming a right or interest in").

of the child sleeping via WhatsApp with the corresponding message, "She fell asleep." [Petitioner Hr'g Ex. O at 141–50]. Respondent—planning to pick the child up later that evening—replied: "nice . . . so I'll take a little longer." [Id.] Petitioner produced multiple excerpts of WhatsApp correspondence between himself and Respondent prior to her removal regarding the child's care and coordinating schedules for visitations. [Id.] Following the child's removal from Brazil, Petitioner continued to remain present in the child's life via routine video calls facilitated by Respondent. [Hr'g Tr. 20:17–19 ("I make video calls with [the child] weekly and two three times a week talking with my daughter.")] These are not the actions of a father who abandoned his child.

In support of her abandonment allegations against Petitioner, Respondent cites: two instances of Petitioner declining to visit his daughter; instances of Petitioner deviating from the parties' co-parenting schedule (e.g., showing up unannounced on some occasions and failing to show up as scheduled on other occasions); Petitioner's allegedly inadequate financial support; and Petitioner's alleged absence from the child's school and pediatrician appointments. [ECF No. 10 at 2–3 (citing Ex. 3 thereto filed under seal)]. Even assuming they are true and construing them in the light most favorable to Respondent, these allegations fail to support Respondent's abandonment claims.

While perhaps further evidence of Respondent's role as the primary caregiver, Petitioner's alleged lack of diligence as a co-parent and his inequitable contributions to the child's care fall short of a showing of abandonment.[15]

---

[15] As stated on the record, [see Hr'g Tr. 6:24–7:2], Respondents reliance on the Brazilian Public Prosecutor's recommendation that an appeal be granted in support of her abandonment allegation is misplaced. [ECF No. 10 at 2 (incorrectly characterizing the recommendation as an "official opinion transform[ing] the Respondent's defense")]. The recommendation—issued by prosecutorial, non-judicial body—does not constitute a finding of fact or a judgment on the merits.

### E. The Child's Removal From Brazil and Retention in Massachusetts

On September 20, 2024, Respondent sought Petitioner's permission to travel with the child to Shrewsbury, MA to visit her aunt. [Pet. ¶ 10 (sic)]. Respondent's aunt had offered Respondent a job. [Id.]. Respondent testified that, at the time, the purpose of the trip was to "help[] her [aunt] out while she was changing careers" and that she had no intention of remaining in the United States. [Hr'g Tr. 40:18–41:3]. Petitioner did not agree to an extended trip to the United States given that the child, in his view, was still adapting to the parties' co-parenting arrangement. [Pet. ¶ 11 (sic)]. Ultimately, after Respondent agreed to relinquish a portion of her parenting time upon return to compensate for Petitioner's missed time under the JCA, Petitioner authorized a 40-day trip to the United States from October 8, 2024 to November 15, 2024. [Id. ¶¶ 12–13 (sic)].

Thereafter, Petitioner executed an international travel authorization ("ITA") memorializing his consent to the trip. [ECF No. 1-6 at 2 (Ex. D to Pet.)]. The ITA provides authorization for Respondent to travel alone with the child internationally between October 7, 2024, and November 27, 2024. [Id.] The ITA includes a disclaimer that the "document does not constitute authorization for permanent residence abroad." [Id. (emphasis added)]. For purposes of this action, the Court finds that the ITA constitutes the parties' operative agreement on the length of the trip and supersedes any conflicting oral agreements.

On October 20, 2024, after arriving in the United States on a tourist visa, Respondent contacted Petitioner to inform him that an opportunity to pursue a master's degree in the United States unexpectedly arose and that she planned to obtain a student visa to remain in the United States with the child. [Pet. ¶ 14 (sic); Hr'g Tr. 43:17–20]. On the same call, Respondent informed Petitioner that she enrolled the child in daycare in Massachusetts.[16] [Pet ¶ 14]. Petitioner objected

---

[16] For record clarity, the Court notes that Respondent enrolled the child in public school in Shrewsbury, MA, not in daycare.

10

to the child's extended stay in the United States and requested that the child be returned to Brazil before the ITA authorization expired on November 27, 2024. [Pet. ¶ 15]. Thereafter, Petitioner continued to express his opposition to the child's retention in the United States and demanded the child's timely return to Brazil. [Id. ¶¶ 15–19 (sic)]. Unwilling to give up the opportunity to obtain a master's degree, Respondent refused to timely return the child to Brazil. [Id. ¶ 20 (sic)].

At an impasse, the parties resorted to the Brazilian civil and criminal justice system. Respondent sought a preliminary injunction in Brazilian court suspending Petitioner's custody rights under the JCA and authorizing her to retain the child in the United States. [Id. ¶ 21 (sic).] Respondent's requested relief was denied twice. [Id. ¶ 17]. On November 25, 2024, Petitioner filed a case in Brazilian court alleging international abduction against the Respondent. [Id. ¶ 26 (sic)]. On December 5, 2024, Petitioner filed a case with Brazil's Ministry of Justice requesting the child's return under the Hague Convention. [Id. ¶ 27 (sic)]. On January 9, 2025, Petitioner filed a criminal action against the Respondent with the Brazilian Federal Police, accusing her of, in part, international child abduction. [Id. ¶ 28 (sic)]. None of these cases altered the parties' respective custody rights under the JCA. Therefore, the Court need not delve into the actions' dispositions.

\* \* \*

Although certain disputed allegations remain unaddressed—including whether Respondent misrepresented the nature and length of her trip to Petitioner to procure his authorization to remove the child from Brazil—the Court declines to issue further findings of fact. The facts discussed above provide the Court with a sufficient factual basis to resolve the Petition under the Hague Convention.

## IV. CONCLUSIONS OF LAW

Based on its factual findings, the Court makes the following conclusions of law:

### A. Petitioner's *Prima Facie* Case for the Child's Return

Respondent argues that Petitioner has failed to demonstrate wrongful retention under the Hague Convention (as implemented by ICARA) because the child's retention in the United States did not violate Petitioner's custody rights and that Petitioner did not exercise his custody rights prior to the child's removal and retention. [ECF No. 10 at 3]. The parties do not dispute that Brazil is the child's country of habitual residence. [Hr'g Tr. 4:21–5:4].

Therefore, the Court's evaluation of Petitioner's *prima facie* case for removal is limited to whether Petitioner "had custody rights immediately prior to the child's removal" and whether he "was exercising those rights." Mendez, 778 F.3d at 343 (citing Hague Convention, art. 3). The Court answers both in the affirmative.

#### 1. Petitioner's Custody Rights

Petitioner has established that he had custody rights immediately prior to the child's removal. "Rights of custody 'may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of [the] State.'" Aredes v. Aredes, No. 22-cv-10666, 2022 WL 2235853, at *4 (D. Mass. June 22, 2022) (quoting Hague Convention, art. 3). "Custody is determined by the law of country in which the child was habitually resident." Mendez v. May, 85 F. Supp.3d 539, 555 (D. Mass. 2015), rev'd on other grounds, 778 F.3d 337 (1st Cir. 2015) (citing Hague Convention, art. 3(a)). Here, the JCA—in effect immediately prior to the child's removal—establishes Petitioner's requisite custody rights.[17] The JCA, approved by a Brazilian court, provides that "[c]ustody will be shared" between

---

[17] See generally, Supra III(A).

12

Respondent and Petitioner with "the child's residence fixed at the mother's home." [ECF No. 1-5 (Ex. C to Pet.)]. At the evidentiary hearing, Respondent conceded that the JCA existed at the time of the child's removal. [Hr'g Tr. 5:5–21]. Respondent fails to point to any judicial decision that invalidated or otherwise altered Petitioner's custody rights under the JCA.

Further, although not dispositive, the fact that Respondent sought Petitioner's permission—granted formally via the international travel authorization—to travel internationally with the child demonstrates Respondent's understanding of Petitioner's custody rights at the time of the child's removal. [Pet. ¶ 10].

### 2. Petitioner's Exercise of Custody Rights

Petitioner has established that he exercised his custody rights immediately prior to the child's removal. "The Hague Convention does not define what constitutes the 'actual exercise' of custody rights." Mendez, 85 F. Supp.3d at 555, rev'd on other grounds, 778 F.3d 337 (1st Cir. 2015) (citation omitted). In the absence of definitional guidance, courts "liberally find 'exercise' [of custody rights] whenever a parent with . . . custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." Id. (quoting Friedrich v. Friedrich, 78 F.3d 1060, 1065 (6th Cir. 1996)). Courts only find a "failure to exercise custody rights on the part of someone with such rights where there were actions 'that constitute[d] clear and unequivocal abandonment of the child.'" Id. (quoting Friedrich, 78 F.3d at 1066). Consistent with the Convention's directive to courts to avoid wading into the underlying merits of custody disputes, "[o]nce [a court] determines the parent exercised custody rights in any manner, the court should stop—completely avoiding the question whether the parent exercised the custody rights well or badly." Bader v. Kramer, 484 F.3d 666, 671 (4th Cir. 2007) (quoting Friedrich, 78 F.3d at 1066).

Here, for the reasons discussed above, see supra Section III(D), Petitioner has demonstrated by a preponderance of the evidence that he exercised custody rights. Albeit not the primary caregiver, because Petitioner was routinely involved in the child's life—e.g., he provided consistent financial support and routinely cared for the child on his own—he clears the exercise of custodial rights hurdle. See supra Section III(D). Petitioner's actions cannot be reasonably construed as amounting to "'clear and unequivocal abandonment of the child.'" Mendez, 85 F. Supp.3d at 555, rev'd on other grounds, 778 F.3d 337 (1st Cir. 2015) (quoting Friedrich, 78 F.3d at 1066).

Having found that Petitioner exercised his custody rights, the Court need not engage in further analysis as to whether the JCA and the events surrounding the JCA likewise establish Petitioner's exercise of custodial rights.

### B. Affirmative Defense

Given that Petitioner has demonstrated wrongful retention under the Convention by showing that he "(1) seeks to return the child to the child's country of habitual residence, (2) had custody rights immediately prior to the child's removal, and (2) was exercising those rights" by a preponderance of the evidence, Mendez, 778 F.3d at 343 (citing Hague Convention, art. 3), the Court must order the child's prompt return unless one of the Convention's "narrow" affirmative defenses apply. 22 U.S.C. §§ 9001(a)(4), 9003(e)(2).

Respondent argues that the "grave risk" affirmative defense applies. [ECF No. 10 at 2]. If Respondent demonstrates that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation" by clear and convincing evidence, the Court need not order the child's return. Hague Convention art. 13(b); 22 U.S.C. § 9003(e)(2)(A). "This is a high burden, and the First Circuit has held that the 'harm

14

must be a great deal more than minimal.'" Moura v. Cunha, 67 F. Supp. 3d 493, 500 (D. Mass. 2014) (citing Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000)).

Here, Respondent falls short of meeting her burden of proof on the "grave risk" affirmative defense. Respondent points to two instances of Petitioner forgoing a visit with the child, Petitioner's deviations from the parties' co-parenting schedule, Petitioner's allegedly inadequate financial support, and Petitioner's absence from pediatrician and school appointments. See supra Section III(D). These scattershot allegations of harm do not demonstrate a "grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention art. 13(b). Respondent left Brazil and sought to remain in the United States to build a more prosperous life for her and her child, not to escape any risk of harm. Respondent's invocation of the "grave risk" affirmative defense fails. Jaimes v. Tavera, No. 1:25-CV-22551, 2025 WL 3534097, at *8 (S.D. Fla. Dec. 10, 2025) (finding no grave risk of harm and observing that the respondent "came to the United States not because of any alleged abuse, but because it was the land of opportunity").

## V.     CONCLUSION

Based on the findings of fact, conclusions of law, and reasons stated herein, the Court **GRANTS** Petitioner's request to order the child's return to Brazil.

SO ORDERED.

Dated: January 12, 2026

                                            /s/ Margaret R. Guzman
                                            Margaret R. Guzman
                                            United States District Judge